# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1110

_____

Ronald I. Goff,

        Appellee,

v.

Dakota, Minnesota & Eastern
Railroad Corporation,

        Appellant.

Appeal from the United States
District Court for the
District of South Dakota.

_____

Submitted: October 18, 2001
Filed: January 14, 2002

_____

Before BOWMAN, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Ronald Goff, a locomotive engineer for the Dakota, Minnesota & Eastern Railroad (DM&E), was operating a DM&E train which derailed in South Dakota. A postaccident drug test revealed the presence of a marijuana metabolite in Goff's system. After an investigation and a disciplinary hearing, DM&E terminated Goff as a result of his drug use. Goff appealed his dismissal to a Public Law Board (the Board), convened pursuant to the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188. The Board reinstated Goff with seniority and benefits but denied his claim for lost

wages. Goff sought further review in the district court, which reversed and remanded the Board's decision, finding that DM&E had committed fraud during the Board hearing and had denied Goff due process. Upon review, we conclude that the district court clearly erred in its findings, and accordingly, we reverse and remand for reinstatement of the Board's order.

## I.

Following the August 22, 1995, derailment near New Underwood, South Dakota, DM&E directed Goff to move the undamaged section of the train on eastwardly. Once relieved by a crew change, Goff and his crew were transported to a local medical center in Rapid City to provide urine and blood samples for a toxicology screening. The medical center split Goff's urine sample into two testable portions. On August 29, 1995, DM&E Vice President of Transportation Robert Irwin informed Goff that his urine sample tested positive for tetrahydrocannabinol (THC), a marijuana metabolite. Goff requested that the untested half of his split urine sample be tested by another laboratory. The second test also came back positive for THC. Irwin ordered Goff removed from service pending a hearing.

Irwin presided over Goff's postsuspension hearing. Goff, the DM&E account technician, the DM&E trainmaster, the President and Conductors Local chairman, and the Locomotive Engineers Local chairman were also in attendance at the hearing. Goff never denied using marijuana, but he asserted that DM&E had failed to follow regulations promulgated by the Department of Transportation's Federal Railroad Administration (FRA) with respect to the tests. Ultimately, Irwin found against Goff and terminated his service effective October 12, 1995, for violation of company rules regarding having prohibited substances in employees' bodily fluids while on duty. Goff appealed the decision. Under the terms of DM&E's collective bargaining agreement with Goff's union, Irwin was assigned to hear Goff's appeal. Irwin upheld

the postsuspension decision to terminate Goff, and Goff then invoked the grievance procedure of the RLA and presented his claims before the Board.

On August 27, 1996, the Board, made up of one union member, one employer member--James McIntyre, president and CEO of DM&E--and a neutral member who acted as the chairman, conducted Goff's arbitration hearing. DM&E had tape-recorded the postsuspension proceedings and had transcribed the recording for the Board to review. Neither Goff nor his union presented any new evidence or called any outside witnesses before the Board. Goff asserted that the drug test results were not admissible evidence because the test was improper under the FRA and therefore could not serve as the basis for disciplinary action.

The Board concluded that DM&E permissibly conducted the drug test pursuant to the collective bargaining agreement, that dismissal of Goff was too harsh, and that he was to be reinstated as a locomotive engineer. The Board ordered Goff to undergo a physical examination, be subjected to random drug and alcohol testing for 60 months, and be terminated if he abused any substances in the future. The Board reinstated Goff's employee benefits and seniority but denied his request for back pay. Goff sought district court review of the Board's decision, arguing he did not receive a full and fair hearing because DM&E failed to disclose who ordered the postaccident drug test and therefore acted fraudulently and violated his due process rights. After holding an evidentiary hearing, the district court agreed with Goff and vacated the Board's decision. DM&E appeals, arguing that the district court exceeded its authority under the RLA.

## II.

We review the district court's conclusions of law de novo and its factual findings for clear error. Bhd. of Maint. of Way Employees v. Soo Line R.R., 266 F.3d 907, 909 (8th Cir. 2001). "We therefore owe no special deference to the district

court's decision to vacate the Board's award." Id. The scope of judicial review of a Board's decision under the RLA is "among the narrowest known to the law." Union Pac. R.R. v. United Transp. Union, 23 F.3d 1397, 1399 (8th Cir. 1994) (internal quotations omitted). Generally, the Board's findings and its order are conclusive on the parties involved in a minor dispute. See Bhd. of Locomotive Eng'rs v. Louisville & N.R.R., 373 U.S. 33, 39 (1963) (noting Congress intended the remedies provided by these boards "to be the complete and final means for settling minor disputes"); see also 45 U.S.C. § 153 First (q).[1] "[T]he fact that 'a court is convinced [the Board] committed serious error does not suffice to overturn [the] decision.'" Major League Baseball Players Ass'n v. Garvey, 121 S. Ct. 1724, 1728 (2001) (quoting E. Associated Coal Corp. v. United Mine Workers of Am., 531 U.S. 57, 62 (2000)). "The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 596 (1960). In keeping with federal policy favoring the enforcement of arbitration awards, a Board's decision may be set aside only for (1) failure to comply with RLA requirements, (2) failure to confine itself to matters within its jurisdiction, or (3) fraud or corruption by a Board member. 45 U.S.C. § 153 First (q); Union Pac. R.R. v. Sheehan, 439 U.S. 89, 93 (1978) (discussing standard of review for National Railroad Adjustment Board decisions).

---

[1]Section 153 First (q) provides, in pertinent part:

> If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such [an] award, then such employee or group of employees or carrier may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order . . . .

The district court found that the Board's decision was premised upon the fraud or corruption of a Board member. See 45 U.S.C. § 153 First (q). Goff must prove the existence of fraud by clear and convincing evidence, that the fraud was not discoverable by due diligence before or during the proceeding, and that the fraud was materially related to an arbitrated issue. Gingiss Int'l, Inc. v. Bormet, 58 F.3d 328, 333 (7th Cir. 1995); Pac. & Arctic Ry. & Navigation v. United Transp. Union, 952 F.2d 1144, 1148 (9th Cir. 1991). Fraud is established if the plaintiff proves that "the defendant made false representations of material fact, intended to induce plaintiff to act, the representations were made with knowledge of, or reckless disregard for, their falsity, and the plaintiff justifiably relied upon those false representations to [his] detriment." Pac. & Arctic Ry., 952 F.2d at 1147 (internal quotations omitted). The appearance of impropriety is insufficient to constitute fraud. Id. at 1148 (stating "because of the strong federal policy favoring arbitration," fraud under § 153 requires "a greater level of improper conduct"). Contrary to the district court's analysis, we conclude that Goff has failed to demonstrate fraud sufficient to overturn the Board's decision.

The evidence illustrates that Goff suspected from the postsuspension hearing forward that Irwin had ordered the test. During the course of his hearings with DM&E, Goff filed a complaint with the FRA in which he contended that the postaccident drug test was improper and that DM&E refused to disclose who ordered the test. Pursuant to Goff's complaint, an FRA representative spoke with Irwin in January 1996 while investigating the circumstances surrounding the drug test. Irwin admitted to the investigator that he ordered the test. In February 1996, Goff requested documentation pursuant to the Freedom of Information Act (FOIA) from the FRA regarding his investigation. Goff did not receive the FOIA documents that confirmed Irwin ordered the test until May 1997, nine months after the hearing before the Board. However, in March or April 1996, several months before the Board hearing, the FRA investigator told Goff that indeed Irwin had ordered the test, and Goff informed his union accordingly. Morever, Goff admitted during the district court hearing that he

5

had suspected Irwin had done so as early as the conclusion of the postsuspension hearing in October 1995.

Goff argues that DM&E President and CEO James McIntyre intentionally misled both him and the Board regarding McIntyre's knowledge of the circumstances surrounding the drug test. Goff contends that McIntyre knew that Irwin ordered the drug test all along and when Goff's union representative asked during the arbitration hearing who ordered the test, McIntyre essentially refused to answer by merely shrugging his shoulders. McIntyre testified that he had no recollection of any such question being asked at the Board hearing or of any shoulder shrugging by him. No other evidence of what transpired before the Board is in the record. Goff further points to a letter he wrote requesting Senator Tom Daschle's assistance in determining who at DM&E had ordered Goff's drug test. In that letter, he asserted as a fact that Irwin had ordered the test. In response to the Senator's inquiry, McIntyre wrote that Goff's assertion that Irwin ordered the test was without proof or documentation. Although McIntyre testified in a deposition some four years later that it was common knowledge that Irwin had ordered the test, McIntyre's responses to the Senator's inquiry and during the Board hearing fail to prove by clear and convincing evidence that he knew at those times that Irwin had ordered the test. (We do not decide whether McIntyre, as a member of the Board itself, was under any duty to answer any question posed by any of the parties before it.)

The district court inferred that McIntyre's vague shoulder shrugging and response letter to Senator Daschle's office showed that he "knowingly intend[ed] to deceive the neutral Board member . . . into believing that McIntyre did not know who ordered the drug tests following the derailment." (D. Ct. Mem. Op. at 10.) However, because Goff admits he knew before the Board hearing that Irwin had ordered the tests, any actions by McIntyre, even if intended to deceive, would not have resulted in Goff justifiably relying on those actions. Goff already had discovered the truth but failed to assert it before the Board. He had informed his union as well, but the union

6

did not offer the evidence either. He cannot now complain of alleged fraud on the part of the railroad. The district court determined that McIntyre's alleged untruthfulness was not discoverable before or during the hearing because Goff did not receive written confirmation that Irwin ordered the drug test until after the arbitration hearing had taken place. We respectfully disagree. The FRA investigator told Goff months prior to the arbitration hearing that Irwin had ordered the test. Not only was it discoverable by due diligence, Goff admits it was in fact discovered.

The district court also found that Goff was denied procedural due process. In addition to the statutorily created parameters of review, courts have recognized that railroad arbitration decisions are reviewable for possible due process violations. See, e.g., Union Pac. R.R. v. Price, 360 U.S. 601, 616 (1959) (finding awards of the National Railway Adjustment Board reviewable for a violation of due process); Shafii v. PLC British Airways, 22 F.3d 59, 64 (2d Cir. 1994) ("Relinquishing courts' ability to review the NRAB's procedures for due process violations would leave unprotected a plaintiff's legitimate constitutional right to be treated in accord with due process before the Board."); Armstrong Lodge No. 762 v. Union Pac. R.R., 783 F.2d 131, 135 (8th Cir. 1986) (reviewing an arbitration award where party argued the arbitration hearing failed to meet the requirements of due process). Under the RLA provisions governing Board hearings, due process requires that: (1) the Board be presented with a "full statement of the facts and all supporting data bearing upon the disputes," 45 U.S.C. § 153 First (i); and (2) the "[p]arties may be heard either in person, by counsel, or by other representatives . . . and the . . . Board shall give due notice of all hearings to the employee." 45 U.S.C. § 153 First (j).

The district court found that Goff's right to due process was violated when the Board was not presented with a "full statement of the facts and all supporting data bearing upon the dispute[]" as required by 45 U.S.C. § 153. DM&E provided a transcript of the postsuspension hearing, but the transcript did not indicate that a ten-minute recess had been taken during the proceedings. During that recess, Irwin, who

7

was the presiding officer, conferred with DM&E's trainmaster in a conference room. Immediately following the recess, Irwin asked the trainmaster if Goff's drug test was conducted under DM&E's private railroad authority or the FRA. The trainmaster responded that the test was performed under DM&E's railroad authority. Under the collective bargaining agreement between DM&E and the United Transportation Union, DM&E reserves the right to conduct urine and blood testing based upon a reasonable cause. However until the recess, all the parties referred to Goff's testing as being performed pursuant to FRA regulations.

The district court concluded that the omission from the transcript of any reference to the recess made the transcript incomplete and biased. The district court found compelling that after the recess, DM&E changed its position regarding under what authority it had acted when it ordered the crew's drug tests. Although the trainmaster's change in position is suspect, there was no evidence presented that during the recess Irwin discussed the merits of the case with the trainmaster. The failure to indicate the occurrence of a recess in the transcript is odd, but we do not find the omission so severe that a due process violation occurred. In fact, there was evidence presented during the district court hearing that the audio recording of the postsuspension hearing was so poor that Irwin's direction to "[t]ake a recess" simply may not have been heard when the recording was transcribed. (Hearing Tr. at 4.)

In addition, the district court concluded that DM&E's refusal to disclose who ordered the drug tests violated Goff's due process rights because he was foreclosed from presenting Irwin's testimony before the Board. Again, we respectfully disagree. Our review of the record discloses that the Board provided Goff with ample opportunity to present his arguments. Goff knew Irwin had been the charging officer but chose not to present any new evidence and instead chose to rely upon the transcript of the postsuspension hearing. At a minimum, Goff could have attempted to call the FRA investigator and put Irwin's admission before the Board, or to put

8

Irwin himself under oath before the Board, either in person or by deposition, or to testify himself concerning what the FRA investigator had told him.

Our review of the record has convinced us that the real issue before the Board was whether the test was performed pursuant to the authority of the federal regulations or pursuant to the railroad's rights under the collective bargaining agreement. The issue was not who ordered the test (although that person could have shed light on the basis for the testing that was ordered). When the Board met, both Goff and his union knew who had done that.

Finally, the district court found a due process violation in that DM&E allowed the charging official to serve as the hearing officer in violation of 49 C.F.R. § 219.104(c)(1). We conclude that Goff waived this procedural defect. "The parties to an arbitration may waive procedural defects by failing to bring such issues to the arbitrator's attention in time to cure the defects." Bhd. of Locomotive Eng'r v. Union Pac. R.R., 134 F.3d 1325, 1331 (8th Cir. 1998). Goff should have raised his procedural objection while the Board had an opportunity to act on it; therefore, Goff waived any procedural defect by not raising it before the Board. See id.

III.

For the foregoing reasons, we reverse the judgment of the district court, and the case is remanded with directions to the district court to reinstate the Board's award.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

9